In Re the Matter of:

Francis KUHN *,

v.

Lionel R. DANES.

No. CS91–3053.

Family Court of Delaware.

Date Submitted: Jan. 18, 2001.
Date Decided: Feb. 1, 2001.

---

* Pseudonyms have been assigned to the parties to protect their identities.

Michael McGroerty, Esquire, Law Office of Michael McGroerty, Seaford, Delaware, counsel for mother.

Lionel R. Danes, Seaford, Delaware, Pro Se.

HENRIKSEN, J.

This is the Court's decision on the custody petition filed by Francis Kuhn, formerly known as Francis Danes, hereinafter referred to as "mother", against Lionel R. Danes, hereinafter referred to as "father". Mother seeks the custody of the parties' nearly thirteen (13) year old son, Ronald A. Danes. Although father also filed a petition construed as a petition for custody, father failed to take and complete the Rule 16 Parent Education Course.

Present in the Court were mother, represented by Michael McGroerty, Esquire, and father, who appeared *pro se*. This custody action comes out of a marriage where the parties were married December 6, 1986, separated in September 2000, and divorced on January 10, 2001. At the time of the divorce, mother resumed her maiden name of Kuhn.

Procedurally, it appears that these parents had their first Court interaction back on March 23, 1998, when the Court grant-

ed emergency temporary custody to the mother. The parties later reconciled. On July 11, 1996, the Court entered a Protection From Abuse Consent Order which was later vacated at the wife's request on May 8, 1997. On September 28, 2000, a hearing was held on mother's petition for Protection From Abuse. The Commissioner found by a preponderance of the evidence that the father had committed an act or repeated acts of domestic violence against mother. Part of this Order required father to surrender his weapons to the Delaware State Police. On November 3, 2000, the father was found in contempt of the Court's PFA Order of September 28, 2000, for failing to have surrendered his weapons. The divorce was entered January 10, 2001, and custody was reserved by mother as part of her request for ancillary relief.

The Court announced its decision from the bench at the conclusion of trial, but provides this Decision and Order for clarification thereof.

### Motion for Directed Verdict—
### 13 Del. C. § 705A [1]

After hearing brief testimony from father, and again later in the hearing after additional testimony, mother moved the Court for a directed verdict. Mother argued that father's testimony gave rise to a rebuttable presumption against father being awarded sole or joint custody or residence of the child based on 13 *Del C.* § 705A, Subsections (a), (b) and (c), which reads as follows:

§ 705A. **Rebuttable       presumption against custody or residence of minor child to perpetrator of domestic violence.**

  (a) Notwithstanding other provisions of this title, there shall be a rebuttable

---

1. Family Court Civil Rule 50, Motion for Directed Verdict, has been omitted from the rules. The Court allows the argument under Family Court Civil Rule 41(b).

presumption that no perpetrator of domestic violence shall be awarded sole or joint custody of any child.

(b) Notwithstanding other provisions of this title, there shall be a rebuttable presumption that no child shall primarily reside with a perpetrator of domestic violence.

(c) The above presumptions shall be overcome if there have been no further acts of domestic violence and the perpetrator of domestic violence has: (1) successfully completed a program of evaluation and counseling designed specifically for perpetrators of family violence and conducted by a public or private agency or a certified mental health professional; and (2) successfully completed a program of alcohol or drug abuse counseling if the Court determines that such counseling is appropriate; and (3) demonstrated that giving custodial or residential responsibilities to the perpetrator of domestic violence is in the best interests of the child. The presumption may otherwise be overcome only if a judicial officer finds extraordinary circumstances that warrant the rejection of the presumption, such as evidence demonstrating that there exists no significant risk of future violence against any adult or minor child living in the home or any other family member, including any ex-spouse.

To fully understand § 705A, the Court needs to consider fully the definitions contained in Section 703A which distinguishes between "domestic violence" and "perpetrator of domestic violence". The definition of "domestic violence", as described in 13 *Del C.* § 703A(a), is as follows:

"Domestic violence" includes but is not limited to physical or sexual abuse or threats of physical or sexual abuse and any other offense against the person committed by 1 parent against the other parent, against any child living in either parent's home, or against any other adult living in the child's home. "Domestic violence" does not include reasonable acts of self-defense by 1 parent for self-protection or in order to protect the child from abuse or threats of abuse by the other parent or other adults living in the child's home.

To fall within the definition of "domestic violence", one need not have been convicted of a criminal charge. On the other hand, to be defined as a "perpetrator of domestic violence" requires a criminal conviction—a conviction beyond a reasonable doubt. A "perpetrator of domestic violence" is defined in 13 *Del C.* § 703A(b) as follows:

"Perpetrator of domestic violence" means any individual who has been convicted of committing any of the following criminal offenses in the State, or any comparable offense in another jurisdiction, against the child at issue in a custody or visitation proceeding, against the other parent of the child, or against any other adult or minor child living in the home:

(1) Any felony level offense;

(2) Assault in the third degree;

(3) Reckless endangering in the second degree;

(4) Reckless burning or exploding;

(5) Unlawful imprisonment in the second degree;

(6) Unlawful sexual contact in the third degree; or

(7) Criminal contempt of Family Court protective order based on an assault or other physical abuse, threat of assault or other physical abuse or any other actions placing

the petitioner in immediate risk or fear of bodily harm. (69 Del. Laws, c. 309, § 4; 70 Del. Laws, c. 186, § 1.)

The Court heard testimony concerning the PFA that was entered by consent of the parties on July 11, 1996, which arose because of the alleged violent acts of the father committed against the mother. Although the Court was mindful of the 1996 Order, because it was a Consent Order and because it occurred several years ago, the Court placed little if any emphasis on that Order. However, on September 28, 2000, the Court held a hearing on a subsequent Protection From Abuse petition filed by wife against husband. Based upon the testimony at that hearing, the Commissioner found by a preponderance of the evidence that the father had committed against the wife acts of domestic violence which clearly involved acts of physical abuse as well as threats of physical abuse. Among those acts, it appears that the Court considered the father butting his head against mother's head and also dragging her by her arms out of the bedroom.

■ The Court notes, however, that the Commissioner's finding of "domestic violence" was a finding by a preponderance of the evidence. It does not rise to the level of a criminal conviction which would have required a standard of proof beyond a reasonable doubt. Therefore, the Commissioner's recent entry of the PFA Order on September 28, 2000, did not place the father in the defined category of "perpetrator of domestic violence".

■ There was also evidence placed into the record of a crime committed by father against mother which resulted in a conviction in the Family Court back in June of 1996. Although the father was originally charged with assault in the third degree and the intent to recklessly cause physical injury to the mother, the charge was amended to a lesser included offense of offensive touching. This act, which clearly constitutes, by definition, an act of "domestic violence", does not rise to the level of defining father as a "perpetrator of domestic violence" pursuant to the definitions required in 13 *Del. C.* § 703A(b). In order to do so, it would have been necessary for father to have been convicted of a violent act against his wife or child which resulted in the conviction of a felony level offense, assault in the third degree, reckless endangering in the second degree, reckless burning or exploding, unlawful imprisonment in the second degree, or unlawful sexual contact in the third degree. The father's conviction of offensive touching did not rise to the level of any of these specifically defined offenses.

■ In addition to the foregoing specific offenses, a "perpetrator of domestic violence" is also defined in 13 *Del. C.* § 703A(b)(7) as an individual who is convicted of "criminal contempt of Family Court protective order based on an assault or other physical abuse, threat of assault or other physical abuse or any other actions placing the petitioner in immediate risk or fear of bodily harm." Mother would argue that father is a "perpetrator of domestic violence" pursuant to this provision. Mother correctly points out that father was subject to the Family Court Protection Order dated September 28, 2000. That Order required, among other things, that father surrender his firearms to the State Police. He did not do so, which led to the subsequent contempt finding of the Family Court dated November 3, 2000. Mother therefore argues that the subsequent finding of contempt for failure to relinquish the firearms makes the father a "perpetrator of domestic violence". Mother's interpretation of the sentence in Sub–Section (7) of 13 *Del. C.* § 703A (b) would be that *any* finding of contempt of

the Court's prior Protection Order, whether or not the subsequent action leading to the contempt was based upon an assault or other physical abuse, makes the father a "perpetrator of domestic violence". The Court disagrees. Instead, the Court believes that the criminal contempt, itself, must be a subsequent act of assault or other physical abuse, threat of assault or other physical abuse, or any other actions placing the petitioner in immediate risk or fear of bodily harm. Every Protection From Abuse Order is based upon an assault or other physical abuse, or threat thereof. The Court does not believe that the legislature would have intended any violation of the Protection From Abuse Order, to elevate the guilty party to the level of a definition of "perpetrator of domestic violence". Instead, the Court believes that the legislature intended this additional Sub–Section (7) to be used when the Family Court has issued a Protective Order, and, thereafter, the restrained party commits a subsequent assault or other physical abuse, or threat. The Court's interpretation makes sense when considering that the other defined crimes necessary to acquire perpetrator status are felonies, or the serious misdemeanors listed in Sections 1 through 6 of 13 *Del C.* § 703A(b), but which do not include lesser included offenses, such as, offensive touching.

◾ Based upon the above, neither husband's 1996 offensive touching conviction, nor the finding against husband in September of 2000 by a preponderance of the evidence that husband had committed an act of domestic violence, nor the combination of the September, 2000 finding with the subsequent contempt for failing to surrender his firearms, elevated father to a "perpetrator of domestic violence". As

such, wife was unable to classify husband as a "perpetrator of domestic violence", which was necessary to create the rebuttable presumption in Section 705A, Supra. Therefore, the Court denied wife's motion for a directed verdict [2] which sought the Court to presume that father could not be granted sole or joint custody or primary placement. Having denied the motion, it was unnecessary for the Court to consider the other statutory considerations that include a determination of whether father had successfully completed a program of evaluation and counseling designed specifically for perpetrators of domestic violence and whether father had successfully completed a program of alcohol or drug abuse.

### FACTS AND REASONING

◾ Given that the Court declined to identify the father as a "perpetrator of domestic violence", no presumption arose which precluded the Court from considering the father for sole or joint custody or placement. The Court next moved on to considering the testimony given to determine, in the best interest of the child, the appropriate custody and visitation for this child. In doing so, the Court considered the mandates of 13 *Del C.* § 722, which reads as follows:

(a) The Court shall determine the legal custody and residential arrangements for a child in accordance with the best interests of the child. In determining the best interests of the child, the Court shall consider all relevant factors including:

(1) The wishes of the child's parent or parents as to his or her custody and residential arrangements;

---

**2.** *Family Court Civil Rule 50, Motion for Directed Verdict,* has been omitted from the

rules. The Court allows the argument under Family Court Civil Rule 41(b).

(2) The wishes of the child as to his or her custodian(s) and residential arrangements;

(3) The interaction and interrelationship of the child with his or her parents, grandparents, siblings, persons cohabiting in the relationship of husband and wife with a parent of the child, any other residents of the household or persons who may significantly affect the child's best interests;

(4) The child's adjustment to his or her home, school and community;

(5) The mental and physical health of all individuals involved;

(6) Past and present compliance by both parents with their rights and responsibilities to the child under § 701 of this title; and

(7) Evidence of domestic violence as provided for in Chapter 7A of this title.

(b) The Court shall not presume that a parent, because of his or her sex, is better qualified than the other parent to act as a joint or sole legal custodian for a child or as the child's primary residential parent, no shall it consider the conduct of a proposed sole or joint custodian or primary residential parent that does not affect his or her relationship with the child. (59 Del. Laws, c. 569, § 4; 67 Del. Laws, c. 236, §§ 2, 3; 69 Del. Laws, c. 309, § 3.)

The parents in this case were married approximately fourteen (14) years, having been married December 6, 1986, separated in September of 2000, and divorced on January 10, 2001. Their son, Ronald, DOB March 22, 1988, will soon be thirteen (13) years of age and is presently in the seventh grade in the Seaford school district. Ronald has been with his mother since the parties separated around September 14, 2000, which also was a time when father experienced an emotional breakdown, leading to his commitment to Meadowood facility in Newark, Delaware. Since that time, the child has resided primarily with mother, and father has had visitation according to the standard guidelines of the Family Court, with the exchange of the child occurring at the Seaford Police barracks.

Based upon the testimony presented by the parents, it was clear that both of the parents would like the child to reside primarily with them. Mother seeks primary placement of the child with her, with father having visitation according to the standard Court guidelines. Father, on the other hand, would like, at minimum, equal time through joint placement, and would allow mother as much time of visitation as she requires.

If the child is to continue to reside with mother, he will be residing in the mobile home and in the neighborhood where he has resided since his early childhood. Although the mother indicates that he has many friends in that neighborhood of his age, the son, in his interview with the Court, indicated that he doesn't care for many of those friends, because they "beat on him". If the child is to reside with the father, at least for the moment, he would be with father in father's mother's home, where father and his mother now reside. The father is presently residing with his mother because the stress of the marital breakup has caused him to quit his prior employment, and has caused him financial hardship. Although the Court believes that both living arrangements are obviously suitable for the child, the Court prefers the residential arrangements which mother offers which provides the stability of the home and neighborhood which the child has known since an early age. The Court considers it more likely that the mother

will continue in the present environment, whereas, father may well move on to another location once he gets on his feet, and this would mean an additional move for the child and disruption in his life.

The Court interviewed near the conclusion of the trial, thirteen (13) year old Ronald Danes. It was clear to the Court that Ronald loves both of his parents. It was also clear to the Court that Ronald wanted to live with his father, but would not be too upset if the Court ordered him to continue to live with his mother. Ronald indicated that he wanted to live primarily with his father because he and his father got along better. Ronald indicated that his mother and he do not get along. Of the greatest concern to the Court was that Ronald indicated that mother slaps him in the face and mouth a lot during arguments. During subsequent in-Court testimony in front of the parties, when Ronald was called as a witness by his father, and on cross-examination, Ronald narrowed the identification of those slaps across the face to three (3) times in the last two (2) months since Thanksgiving of 2000. On one occasion, Ronald's lip was broken on the inside due to the contact of mother's hand with his mouth. Certainly, Ronald's wishes as a thirteen (13) year old are heavily considered by the Court in its final decision, although Ronald's wishes are not the only factor.

The Court also considered the interaction and interrelationship of Ronald with his parents and other significant persons who live with him or who may significantly affect his best interests. On the mother's side, the Court learned that Ronald has a grandmother in Cape May who he visits with his mother frequently, and perhaps as much as several times a month. Ronald also had a grandfather (now deceased) on mother's side who was a Marine, and Ronald indicated that he would like to grow up and fly airplanes or be a Marine. On mother's side, Ronald also has a step-grandmother who Ronald gets to visit occasionally. Most importantly, however, is that Ronald has a nineteen (19) year old half-sister, Tanya, who is mother's daughter by a previous relationship, and who lives close by. Tanya lives with her boyfriend within a few blocks of mother's house and also within a few blocks of the school. After school, Ronald often goes to the Boys and Girls Club located near the school until his mother is able to pick him up after her work. Ronald often also goes over to Tanya's after school. Mother is currently employed at Hopkins Auto Sales where she has been employed since July of 2000 and works Mondays through Fridays from 9:00 a.m. to 6:00 p.m. Prior to that, mother worked two (2) years at Quality Mechanical Associates. Mother's employment is approximately two-and-one-half (2–½) miles from the school, and she testified that she has the flexibility to leave work in the event of an emergency involving Ronald. Sister, Tanya, who also lives nearby, can also be available in the event of an emergency.

While father is living at his mother's house, there are also many significant individuals who impact positively on Ronald's life. First of all, Ronald's paternal grandmother lives there, and Ronald indicated that he gets along well with his paternal grandmother. Ronald also told the Court that while at his paternal grandmother's house with his father, he frequently sees his eleven (11) year old cousin, Beth and his three (3) year old cousin Rebecca, who live with his aunt (father's sister) in Milford, Delaware. He also often sees his eighteen (18) year old cousin, Jackie.

Thus, Ronald has good interaction with relatives on both sides of his family. However, father is presently residing in his mother's house because of father's pres-

ently diminished lack of employment and financial stress. On the other hand, mother remains gainfully employed and continues to live in the environment where Ronald is accustomed. Additionally, the Court likes the additional security of Tanya, Ronald's half sister, living close to Ronald's home and school, so that Tanya can come to Ronald's assistance in the event the mother is unable. In addition, the Court notes that mother's employment is approximately two-and-a-half (2-½) miles from the school. Although father does not really know where he will be working tomorrow, if he will be working at all, his next job appears to take him to Federalsburg, Maryland, where he needs to be at work by 7:00 a.m. Since father's emotional breakdown in September of 2000, father's work has been sporadic and uncertain, while mother's work has been consistent and stable.

Next, the Court considered testimony about factors which would affect Ronald's adjustment to his home, school and community. Under the present circumstances, which includes father living with his mother, there is minimal adjustment. Ronald would attend the same school in either situation. The Court also believes that Ronald would be comfortable living in either his mother's home, or in his grandmother's home, although the Court again notes that Ronald has lived in his mother's home since he was a young child. There is little adjustment to Ronald's community, except that he would be moving away from his friends in the immediate neighborhood where he has had those friends all of his life. However, the Court suspects that a twelve (12) year old would also have other friends at school, and these close neighborhood friends begin to take on less importance in Ronald's life. As previously stated, however, the Court continues in its concern about the lack of stability in father's life at this time. Father presently lives with his mother, but may not at some future time. A move by father could mean an extremely different school system for Ronald. Father's employment for both the present and the future are uncertain. Because of those uncertainties, it is difficult to predict where father will be living in the future.

In this case, the mental and physical health, especially the mental health, is a factor of considerable importance. The Court found the mother to be both physically and mentally healthy. The Court will note, however, that the one concern the Court has about the mother is her manner of disciplining the child whereby she strikes her child in the face. It appears to the Court that mother and child are involved in frequent bickering which the Court finds consistent with numerous mother-adolescent son relationships in a family divided by a recent divorce. The Court recommends, and, in fact, ORDERS that mother and child both have counseling. Child's counseling shall be so that child has an opportunity to sit down with a qualified individual to determine if the child needs to discuss matters related to the divorce, and also to determine what friction, if any, exists between mother and child, and how to resolve that friction. The Court also ORDERS mother to have counseling with the same counselor which will include private sessions between counselor and mother to address mother's methods of disciplining the child, and also joint sessions between mother and child which will address the present and potential future friction between mother and child.

The Court's requirement of counseling for the child is because the child indicated to the Court that, although his grades were never great, they have suffered by reason of the stress of the divorce action. The Court believes that it is in this child's

best interest to have someone to talk to in order to resolve these problems, to be convinced that the child is not the cause of the divorce between his parents, and to help the child see his own positive self-worth so that he can pursue his studies to better excel in school, and to help him, therefore, better excel in his future. In speaking with this child, the Court believes that he has wonderful potential, believes that he knows that he is loved, but would benefit having this reinforced. The Court believes that, given appropriate opportunities and love from both parents, this child will better himself by living up to his full potential, better pursuing his studies at school, and also give his best and utmost to his future activities, both in school and out of school.

Of the greatest concern to the Court in this matter is the father's present mental health, and possible physical health. The Court heard testimony from Ronald's half-sister, Tanya, about an incident in July of 2000, when the family was driving to Ocean City, and, suddenly, father did not know who he was, who anyone else was, nor where he was. The memory loss lasted approximately three (3) to four (4) hours, and father eventually returned to his senses. According to father's testimony, he never pursued any subsequent investigation or treatment of this memory lapse. More importantly, father experienced an emotional breakdown on September 14, 2000, which led to a six (6) day commitment at Meadowood in Newark, Delaware. Father has not had any counseling or treatment since his release from Meadowood. Around September of 2000, father, because of stress, quit his job which he had held for three (3) years. His work since that time has been sporadic and uncertain. The Court is concerned that father's lack of employment, lack of his own living accommodations, and his lack of pursuing counseling following an emotional breakdown suggests that father may still be suffering from untreated emotional damage. The Court cannot take the chance of placing thirteen (13) year old Ronald with his father, when the Court is not convinced of the stability of the father's situation. For this reason, the Court will ORDER that the father undergo stress and anger management counseling. The considerations of the physical and mental health of the parents favor the award of primary placement to mother.

The Court has also considered how the testimony of the parties impacted on the past and present compliance of both parents with their rights and responsibilities to their child under 13 *Del C.* § 701. The Protection From Abuse Order entered by the Court on September 28, 2000, was an Order entered for the protection of the family, but also an Order entered in the best interests of the family, and the children. That Order expected the father to comply with the Order, which included the father surrendering his firearms. Not until the father was found in contempt on November 3, 2000, did father surrender his firearms. Part of a parent's responsibilities is his/her compliance with Court Orders, and the father deliberately did not do so in this action. The Court will note, however, that this was a minor consideration in the overall determination of the custody of this child.

Finally, in determining the best interests of the child, the Court considered the testimony regarding the domestic violence which had been demonstrated by the father against the mother and in the presence of the child. The 1996 PFA was a Consent Order, and the Court gives no weight to the entry of this Consent Order, except to note that there were apparent problems between the parties. However, the September 2000 Order which followed a hearing, clearly demonstrates that the

father, at least by a preponderance of the evidence, had committed domestic violence against his wife, and in the presence of the child. It may well be that this domestic violence was related to the nervous breakdown which father was experiencing around that time which led to his commitment to Meadowood. The Court notes that the commitment to Meadowood was the only time that father has had to seek psychological assistance, it being the father's testimony that he had never had previous psychological problems. However, mother's testimony noted several incidences of violence committed against her, and in the presence of the child, which were committed over a considerable amount of time prior to the September, 2000 Order. These earlier repeated acts suggest that father was not always on the verge of an emotional breakdown when they were committed. It should be noted that there was testimony by the parties, and verification by the son, that father at one time placed the child up against the wall of the school because the child had spit on another child. The Court does not see this as a continuing course of events of violence exhibited by father against child, because the son told the Court that the father had only been aggressive with the child on a few occasions, and normally when the child had done something very wrong. Still, there were several acts of domestic violence committed by father against mother over time, and the Court is concerned that these acts were also committed in the presence of the child.

In summary, Ronald wishes to live primarily with his father. However, Ronald also indicated it would be agreeable to him if he remained with his mother. Although Ronald's wishes were given considerable weight, they are outweighed by the other considerations of the Court which led this Court to believe that having Ronald live primarily with mother gives Ronald con-

siderably greater stability, back up assistance in the event of an emergency, and predictability of living with an employed parent in a home location that is not likely to change in the near future. Also, except for the Court's concerns about mother's method of disciplining Ronald, and also the friction that appears to be occurring between mother and her soon-to-be adolescent son, the Court is secure with mother's mental stability. On the other hand, the Court still has considerable concerns about father's mental health, for which father has not yet sought appropriate care and treatment.

The Court next turns to the considerations which are required under 13 *Del C.* § 707A. That statute requires this Court, where joint custody is awarded to a father who has committed acts of domestic violence, to order father to complete a program of evaluation and counseling designated specifically for perpetrators of domestic violence and conducted by a public or private agency or a certified mental health professional. The statute also goes on to say that a parent may also be ordered to attend alcohol or drug abuse treatment. However, the Court does not find alcohol or drug abuse to be relevant factors in this action. Instead, the evaluation and counseling needs to be directed towards father's emotional health and how he handles stress and anger. Also, as a result of 13 *Del C.* § 708A, the Court is required to determine a schedule, location, and conditions for visitation that best protects, in this case, the wife, from further violence. Thus, in this case, the Court will require that all exchanges of visitation occur at the Seaford Police Department.

The Court also notes that the parties have been following the Court's standard visitation guidelines pursuant to an agreement previously entered into between

them. The only change to the Court's standard guidelines requested by mother, is that the pick up times on Fridays of alternate weekends as well as every Wednesday evening, be changed from 6:00 p.m. to 6:15 p.m. in order that mother is not docked pay in order to leave work early. This seems reasonable to the Court, especially where the Court intends, at least on the Wednesday evenings, to change the return time to 9:15 p.m. The Court does not see a need, given the overall length of the weekend, to change the Sunday return time from the now scheduled 6:00 p.m. time.

### CONCLUSION

For all of the foregoing reasons, it being in the best interest of Ronald A. Danes, born March 22, 1988, the Court finds the following:

1. Joint custody of Ronald A. Danes, DOB 03/22/88, is hereby awarded to his mother, Francis Kuhn, f/k/a Francis Danes, and his father, Lionel Danes.

2. Primary placement of Ronald A. Danes, DOB 03/22/88, is hereby awarded to his mother, Francis Kuhn.

3. Father shall have visitation according to the standard visitation guidelines of the Family Court of the State of Delaware, except for the following modifications:

   (a) The alternate weekend pick up is hereby changed from Friday at 6:00 p.m. to Friday at 6:15 p.m. The return time on alternate weekends of Sunday at 6:00 p.m. shall remain the same. ·

   (b) The pick up time for the every Wednesday visitation is hereby changed to 6:15 p.m., and the return time for said Wednesday evening visitation is changed to 9:15 p.m.

   (c) All exchanges of the child shall occur at the Seaford Police Department in Seaford, Delaware.

4. Mother shall arrange for counseling for Ronald A. Danes, DOB 03/22/88, herself, and joint counseling for herself and her son. The son's counseling shall be directed towards evaluating and counseling son on the emotions he may be feeling as a consequence of the divorce in order that the son will have a neutral qualified individual to which he may express his concerns and discuss the problems he may experiencing with either or both of his parents, as well as his friends, and with his own self-worth. Mother's counseling shall be directed towards her form of discipline, the Court noting that it finds disagreeable conduct wherein mother's discipline of son involves striking her son in the face. The joint counseling involving both mother and son shall be directed towards attempts to resolve possible friction between son and mother which may be the result of the divorce, or which may simply be the result of frictions often seen between an adolescent son and his mother, especially were a father is not present in the household.

5. Pursuant to 13 *Del C.* § 707A, Lionel Danes, father of Ronald A. Danes, is hereby ordered to complete a *program of evaluation and counseling designated specifically for perpetrators of domestic violence* and conducted by a public or private agency, or a certified mental health professional.

6. As to all of the counseling ordered herein, it is expected that each of

the parties will make contacts with the respective counselors within one (1) month's time from the date of this Order. It is further ordered that each of the parties shall direct a report from the respective counselor to be sent to this Judge's attention at this Court, within six (6) months from the date of this Order, which report will describe the dates of the visits, a brief description of what occurred at each visit, the status of the progress of the individual regarding the concerns of the Court, and whether or not, in the counselor's opinion, the individual requires to have additional counseling. At such time as the counselor is satisfied that the individual being counseled has satisfactorily completed the counseling, the counselor shall provide the Court with a statement to that effect, and outlining the basis for the counselor's conclusion. These reports should be sent to the attention of the Honorable John E. Henriksen, Associate Judge, Family Court of the State of Delaware, 22 The Circle, Georgetown, Delaware 19947 and reference Court File CS91–3053.

7. Each of the parents are directed to demonstrate appropriate conduct towards each other, it being explained to them in the Courtroom that they have a mutual interest, being the welfare, growth and development of their child who loves both of them.

8. The Court recognizes that there is presently in force an Order of Protection From Abuse which requires father to stay one hundred (100) yards away from mother's person, residence and workplace. Said Order of Protection From Abuse is dated September 28, 2000. The terms of said Order continue to remain in full force and effect with the exception that the parties may meet at the Seaford Police Department in order to make exchanges for visitation. In addition, father may also be within one hundred (100) yards of mother for purposes of attending school and extracurricular activities that involve the child, although father should continue to remain at a meaningful distance from mother during these exposures, and to conduct himself appropriately.

9. Each parent shall provide to the other, according to 13 *Del C.* § 727, all material information concerning the child's progress in school, medical treatment, significant development in the child's life, and school activities and conferences, along with special religious events and other activities in which parents may wish to participate.

**IT IS SO ORDERED.**